**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MUHAMED BOROVINA, | ) | |
| Plaintiff, | ) | Civil Action No. 14-124 Erie |
| | ) | |
| v. | ) | District Judge McVerry |
| | ) | Magistrate Judge Baxter |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment (ECF No. 9), grant Defendant's Motion for Summary Judgment (ECF No. 12), and affirm the decision of the administrative law judge ("ALJ").

**II.      REPORT**

**A.      BACKGROUND**

**1.      Relevant Procedural History**

Plaintiff Mohamed Borovina brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner"), granting his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401- 434, 1381-1383f ("Act"), as of June 7, 2011. Plaintiff filed for benefits on May 11, 2011, claiming an alleged onset date of disability of December 18, 2008, due to disorders of the back (discogenic

and degenerative) and diabetes mellitus (R. at 78-79).[1] His application was initially denied on June 17, 2011 (R. at 80, 85), and an administrative hearing was subsequently held before an Administrative Law Judge ("ALJ") on August 16, 2012, at which Plaintiff was represented by legal counsel (R. at 31-57). Testimony was provided by Plaintiff and a vocational expert ("VE") (R. at 31). After the hearing, the ALJ concluded that, prior to June 7, 2011, Plaintiff could perform a range of light work existing in significant numbers in the national economy, but that, as of June 7, 2011, no jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 18-25). Thus, Plaintiff is here challenging the ALJ's denial of benefits from December 18, 2008, through June 6, 2011. This matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 9, 12).

## 2. Relevant Factual History

### a. General Background

Plaintiff was forty years old on the date of the ALJ's decision (R. at 35). He was raised in Bosnia and moved to the United States in 2001 (R. at 37). He has a high school education and understands some English, but is unable to speak English fluently (R. at 37). He lives with his mother, his wife, and his four children, the oldest of whom was eleven at the time of the ALJ hearing (R.36). He last worked, for three months, as a part-time van driver for the International Institute in 2010, but stopped due to back and hip pain (R. at 38). Prior to that, he worked as a mixer operator in a bakery, and also held jobs as a laborer and a line assembler (R. at 38-39).

### b. Relevant Medical History (12/18/08 – 6/7/11)

Prior to Plaintiff's alleged disability onset date of December 18, 2008, the medical record reveals that, while living in Bosnia in the 1990's, Plaintiff was struck by grenade shrapnel, one

---

[1]

Citations to the administrative record (ECF No. 6) will be designated by the citation "(R. at __.)"

piece of which became lodged in his back (R. at 39). Plaintiff had no issues with the shrapnel in his back until he underwent an MRI, following surgery to his left elbow, on December 18, 2008 (R. at 208, 397). During the MRI, the metallic shrapnel fragment moved, causing Plaintiff to experience pain soon after entering the MRI machine (R. at 208, 237). Several days later, a chest x-ray confirmed that the shrapnel "projected adjacent to the left anterior aspect of the T11 or T12 vertebrae" (R. at 213).

On January 16, 2009, Plaintiff was examined by Jeffrey Levine, M.D., who reported that he was not able to palpate the shrapnel, but could see the shrapnel in the lateral view of Plaintiff's chest x-ray, though it was not visible from the posterior-anterior view (R. at 208). A CT scan was ordered to better locate the shrapnel (Id.). At the time, Plaintiff denied having any neurologic symptoms, numbness, weakness, or shortness of breath (Id.). On January 30, 2009, the results of the CT scan revealed, *inter alia*, "metallic density … along the left side of the lower thoracic spine likely from some reported shrapnel," as well as non-calcified pleural plaques in Plaintiff's left lung, most likely related to previous trauma (R. at 210).

On February 18, 2009, Plaintiff followed-up with Dr. Levine, at which time Plaintiff noted that the pain in his back had decreased, but standing long periods of time caused him to experience significant back pain. (R. at 207). Dr. Levine reported that he did not feel comfortable removing the shrapnel, and recommended an evaluation by Daniel Loesch, M.D., a neurosurgeon (Id.).

Plaintiff was subsequently evaluated by Dr. Loesch on March 30, 2009. Physical examination revealed that Plaintiff's station, gait, and tandem gait were normal; his cervical posture, thoracic kyphosis, lumbar lordosis, and sagittal spinal alignment were all normal; his range of motion in the cervical and lumbar spine was normal; he exhibited no pain to palpation

or compression of the ribs or thoracic spine; he exhibited 5/5 strength in extension and flexion, both proximally and distally, in all four extremities; his deep tendon reflexes were 1+ throughout; and his sensory function was intact (R. at 268-269). Upon review of Plaintiff's radiographic studies, Dr. Loesch observed that the shrapnel was located about a centimeter from the aorta in the left anterolateral portion of the thoracic vertebrae, apparently "in the bone itself" (R. at 269). Dr. Loesch concluded that Plaintiff had improved and he was not sure removal of the shrapnel would change much. To ensure that nothing was missed, however, he ordered a myelogram and a post-myelogram CT scan of the thoracic and lumbar spine (Id.).

The CT scan was subsequently performed on April 23, 2009, and revealed that the shrapnel was "lodged against the left ventral periosteal margin of the T12 vertebral body;" however, the scan disclosed "no metal fragments in the region of neural structures, spinal canal or foramen," and no lumbar disc protrusion, canal stenosis or nerve root impingement. (R. at 270).

On May 21, 2009, upon referral from Dr. Loesch, Plaintiff was seen by Leo Fitzgibbon, M.D., a cardiothoracic surgeon, for assessment of the shrapnel's involvement with the thoracic aorta. At the time, Plaintiff reported that his low-back was intermittent and nagging, but had actually improved since he was seen by Dr. Loesch (R. at 275). Dr. Fitzgibbon noted that, although the shrapnel fragment was in close proximity to the thoracic aorta, it did not involve the aorta itself. (R. at 276). In addition, he found that Plaintiff's lungs were clear; his extremities exhibited no cyanosis, clubbing, or edema; and his sensory, motor functions, and reflexes were symmetric in his upper and lower extremities (R. at 275-276).

Plaintiff returned to Dr. Loesch on June 1, 2009, and stated that he didn't want surgery or pain management; yet much of the visit was spent on discussing Plaintiff's feelings that he was

"fairly disabled from this" (R. at 220). Dr. Loesch assured Plaintiff that he had no signs of instability, fractures, or compression of the nerve roots or spinal cord, and that any discomfort Plaintiff felt was merely "aggravation as opposed to outright damage" (Id.). As a result, Dr. Loesch advised Plaintiff that it was unlikely he was going to have any significant disability, and that he "just has to try and get active and tolerate the discomforts until they settle down" (Id.). He then noted that there was nothing further he could do for Plaintiff and recommended that Plaintiff "slowly try[] to re-integrate into work and perhaps pain management. (Id.).

The same day, Plaintiff was seen by his family physician, Merja Wright, M.D., who noted that Plaintiff is an early diabetic and has metabolic syndrome, for which Plaintiff refused to take recommended medication (R. at 393). Dr. Wright noted that Plaintiff refused to follow any non-medicinal regimens for his conditions, as well, including diet and exercise (Id.). On examination, Plaintiff was alert, oriented, and in no acute distress; his vital signs were stable; his lungs were clear; his cardiac function was normal; his abdomen was soft; and his extremities, other than his left elbow, were normal (Id.).

On January 11, 2011, Plaintiff was seen by Ghulam Abbas, M.D., for evaluation of his back pain. Dr. Abbas noted that, since the MRI incident on December 18, 2008, Plaintiff has complained of "restlessness, depression, anxiety, and severe back pain, due to which he cannot even sit in 1 position for a few minutes," as well as radiating pain from the mid back to the upper back between the shoulder girdle (R. at 236). Dr. Abbas noted further that Plaintiff was "unable to be employed at this time due to his pain issues" (R. at 237). Nonetheless, physical examination revealed that Plaintiff's lungs were clear; his cardiovascular function was regular; his extremities exhibited no clubbing, cyanosis, or edema; his cranial nerves were grossly intact; and his musculoskeletal strength was "strong" (R. at 238). Dr. Abbas discussed surgical

intervention to remove the shrapnel, noting his belief that the risk of paraplegia was very small; yet, Plaintiff was reluctant to undergo surgery (R. at 236, 238).

On March 8, 2011, Plaintiff followed-up with Dr. Wright, indicating that he and his wife were still thinking about surgery, but were leaning against it (R. 387). Plaintiff reported that his pain was intermittent, not constant, and that certain positions were worse than others (Id.). On examination, Plaintiff was alert, oriented, and in no acute distress, and his vital signs were stable. Plaintiff returned to Dr. Wright on April 14, 2011, at which time he reported having experienced a third episode of what he described as temporary blindness lasting about fifteen minutes, and admitted to experiencing some intermittent numbness, tingling, and extremity weakness of an indefinite nature (R. at 386). Physical examination was largely normal, with the doctor noting that she did not "really see much difference" (Id.). Dr. Wright saw Plaintiff again on May 19, 2011, at which time Plaintiff reported another episode of "blindness," although he denied having any associated headache, numbness or tingling, urinary, or any other symptoms (R. at 385). Dr. Wright noted that the episode sounded like a "migraine equivalent or something like MS," but was unable to assess Plaintiff's condition with an MRI, due to the shrapnel (Id.).

On May 31, 2011, Plaintiff underwent a neurological examination by Islam Zaydan, M.D., regarding his visual disturbances (R. at 260). Plaintiff was found to be alert and oriented with normal recent and remote memory; normal language function, attention, concentration, and comprehension; normal cranial nerves bilaterally, with occasional periocular facial spasms; normal muscle bulk and tone, with 5/5 muscle power in both upper and lower extremities; unremarkable sensory function and deep tendon reflexes; and normal gait and station (R. 261). Dr. Zaydan's differential diagnoses included migraine headache with aura, hypoglycemia, and

possible focal seizures (R. at 262). He prescribed Fioricet to be taken as needed for headaches, and ordered an EEG to rule out the possibility of seizures (Id.).

On June 7, 2011, Plaintiff was involved in a chain-reaction motor vehicle accident in which his vehicle was rear-ended (R. at 333, 381). Plaintiff was initially diagnosed with an acute cervical sprain, but later developed low back pain, which he associated with the motor vehicle accident (R. at 299, 315, 383). Plaintiff also reported that the accident exacerbated his complaints of anxiety and depression (R. at 356). The ALJ ultimately found Plaintiff to be disabled as of June 7, 2011, as a result of the injuries he suffered in the motor vehicle accident (R. at 22, 25-26).

<u>c.</u>        **Administrative Hearing**

On August 16, 2012, the ALJ conducted an administrative hearing at which Plaintiff, his counsel, an English interpreter, and a vocational expert ("VE") were present (R. at 31-57). Both Plaintiff and the VE testified at the hearing. Plaintiff testified that he had a lot of pain in his back for the first couple of months after the MRI incident of December 18, 2008, but then it got a little better, even though pain persisted (R. at 40-41). As of the date of the ALJ hearing, Plaintiff testified that he'd been having a lot of back issues for about two years, which caused him to experience discomfort and fluctuating pain that was helped by medication (R. at 41). He estimated that he could sit or stand a maximum of fifteen minutes at a time (Id.). Plaintiff testified that most of the pain he was experiencing at the ALJ hearing was attributable to his motor vehicle (R. at 51).

The VE then offered testimony and was asked by the ALJ to consider a hypothetical individual with Plaintiff's vocational profile, who could lift/carry 20 pounds occasionally and 10 pounds frequently; could stand, walk, or sit for six hours of an eight-hour workday; could never

climb ropes, ladders, or scaffolds, but could occasionally climb ramps and stairs; could occasionally balance, stoop, kneel, crouch, and crawl; could frequently handle and finger with the left upper extremity, and could occasionally push or pull with the right, lower extremity; must avoid concentrated exposure to loud noise and even moderate exposure to hazards; could perform simple, routine, repetitive tasks, doing low stress work that involves occasional, simple decision-making, occasional changes in work setting, occasional interaction with coworkers and supervisors, and no interaction with the public; and could not communicate in English, but could understand basic instructions in English (R. at 53).[2] The ALJ then asked if there were any jobs available in the national economy that such a person could perform. In response, the VE testified that such an individual would be able to perform work as a sorter, garment folder, or shoe packer (R. at 53-54).

## B. ANALYSIS

### 1. Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); Brewster v. Heckler, 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. § 404.1520.

---

[2]

On June 14, 2011, state-agency expert, Gregory Mortimer, M.D., reviewed Plaintiff's medical record and opined that Plaintiff retained the residual functional capacity to occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds; to stand/walk or sit about six hours per eight-hour workday; to occasionally balance, stoop, kneel, crouch, crawl, and climb; and to avoid even moderate exposure to hazards (R. at 63-64). The following day, state agency expert psychologist, George Ondis, Ph.D., opined that Plaintiff had a mild restriction in his activities of daily living and mild difficulties in maintaining social functioning, concentration, persistence, or pace, with respect to his mental impairments, which Dr. Ondis did not consider severe under the Regulations (R. at 62).

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); see Barnhart v. Thomas, 540 U.S. 20, 24-5, (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. Doak v. Heckler, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. See 5 U.S.C. §706. The district court must then

---

[3]

42 U.S.C. §405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

[4]

42 U.S.C. §1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. Burns v. Barnhart, 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. Palmer v. Apfel, 995 F. Supp. 549, 552 (E.D. Pa. 1998); S.E.C. v. Chenery Corp., 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. Chenery, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." Monsour Medical Center v. Heckler, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

## 2. ALJ's Decision

At step one of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of December 18, 2008. (R. at 15). At step two, the ALJ concluded that the residual effects of the shrapnel in Plaintiff's T11 and T12 paraspinal region, the residual effects of the left elbow surgery, the major depressive disorder, and post-traumatic stress disorder were severe impairments, but determined at step three that

they did not meet or medically equal the requirements of any listed impairment (R. at 15-16).

Before proceeding with steps four and five, the ALJ found that, before June 7, 2011, Plaintiff retained the residual functional capacity ("RFC") to perform a range of light duty work consistent with his hypothetical question to the VE (R. at 18-22).[5] Then, at step four, the ALJ found that, before June 7, 2011, Plaintiff could not perform any of his past relevant work (R. at 22-24); but, at step five, found that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed prior to June 7, 2011 (R. at 24). Thus the ALJ concluded that Plaintiff was not disabled under the Act before June 7, 2011 (R. at 25). As of June 7, 2011, however, the ALJ found that Plaintiff had the RFC to perform less than the full range of sedentary work, and that no jobs existed in significant numbers in the national economy that Plaintiff could perform (R. at 25). Accordingly, the ALJ concluded that Plaintiff was disabled under the Act as of June 7, 2011 (Id.). The Court must affirm this determination unless it is not supported by substantial evidence. See 42 U.S.C. § 405(g).

### 3. Review of ALJ's Decision

Plaintiff argues that the ALJ failed to properly consider the medical evidence of record and, thus, erred in determining that Plaintiff was not disabled before June 7, 2011. (ECF No. 10 at pp. 12). The Court disagrees.

It is evident from the ALJ's well-reasoned decision that he thoroughly considered and gave appropriate deference to the entire medical record in making his findings. In particular, the ALJ acknowledged that Plaintiff had several severe physical and mental impairments since the

---

[5] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000); quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999); see also 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). In making this determination, the ALJ must consider all the evidence before him. Burnett, 220 F.3d at 121.

alleged onset date of December 18, 2008; however, none of them were found to have met or equaled the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 15-17). This latter finding is adequately supported by the record and is not specifically challenged by Plaintiff.

Second, in support of his conclusion that Plaintiff was not disabled prior to June 7, 2011, the ALJ thoroughly summarized the various physicians' clinical findings upon which he relied. See 20 CFR §§ 404.1529(c)(2), 416.929(c)(2) (ALJ should examine the severity of the claimant's symptoms against the medical evidence). The Third Circuit Court of Appeals has emphasized that, in accordance with the Act, "the Commissioner must evaluate pain and other subjective complaints on the basis of medical signs and findings that could reasonably be expected to produce the subjective symptoms alleged." Fearbry v. Barnhart 79 F.App'x 535, 536 (3d Cir. 2003) ("While a claimant's subjective symptomatology must be considered and can support a finding of disability, the claimant's subjective complaints, without more, do not in themselves constitute disability"); Clark v. Astrue, 2014 WL 4411586, at *6 (M.D.Pa. Sept. 8, 2014) ("Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work …. In so doing, the medical evidence of record is considered along with the claimant's statements") (citing 20 CFR § 404.1529(b)).

 Here, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms prior to June 7, 2011, not credible (R. at 19). Among the clinical findings cited by the ALJ in support of this finding are notations by Drs. Levine, Loesch, and Fitzgibbon, all indicating that Plaintiff's back pain was improving despite limited treatment, and that Plaintiff consistently exhibited a lack of neurological and functional deficits upon physical

examination (R. at 19-20). Of these, the ALJ gave significant weight to Dr. Loesch's assessment that Plaintiff was "unlikely" to have any "significant disability" from his condition, and his suggestion that Plaintiff re-integrate into the work force, because they were found to be well-supported by the medical evidence (R. at 20).

Plaintiff challenges the latter finding in particular, arguing that the ALJ "misconstrued and took out of context Dr. Loesch's remark," and rejected medical evidence that the shrapnel fragment in Plaintiff's back "was causing significant disability and dysfunction;" however, the medical records Plaintiff cites in support of this contention are inapposite. (ECF No. 10, Plaintiff's Brief, at 13). Specifically, Plaintiff cites Dr. Loesch's consultation report of March 30, 2009 (R. at 268-269), Dr. Loesch's office note of June 1, 2009 (R. at 220), and Dr. Fitzgibbon's consultation report of May 21, 2009 (R. at 275-276). None of these records indicates that the shrapnel fragment in Plaintiff's back was causing him "significant disability and dysfunction." To the contrary, on March 30, 2009, Dr. Loesch's clinical findings upon physical examination were unremarkable, and he specifically noted that "there is no evidence of pain to palpation nor compression of the ribs or the thoracic spine" (R. at 268-269). He noted further that Plaintiff did not have any numbness, weakness, tingling, bowel or bladder dysfunction, or ambulatory dysfunction, and Plaintiff's "pain is maybe improved about 50 percent" (R. at 268). On June 1, 2009, Dr. Loesch noted that Plaintiff had "no signs of instability" and no "fractures, compression of the nerve roots or spinal cord," and that any discomfort Plaintiff felt was due to aggravation, as opposed to "outright damage" (R. at 220). As for Dr. Fitzgibbon, he noted that Plaintiff described his back pain as "intermittent and nagging" and "actually improved" (R. at 275). Dr. Fitzgibbon's physical examination of Plaintiff was also essentially normal, and he again noted that Plaintiff's pain was "getting somewhat better" (R. at 276). Thus, all of the foregoing

findings to which Plaintiff draws the Court's attention actually reinforce, rather than contradict, the ALJ's finding that Plaintiff was not physical disabled prior to June 7, 2011.

Nonetheless, Plaintiff also "asserts that his mental health conditions were in existence on his alleged onset date, and only worsened from that time" (ECF No. 10, Plaintiff's Brief, at p. 14). However, there is very little medical evidence of record to support this assertion. As duly noted by the ALJ, Plaintiff "did not initiate formal mental health treatment under August 2011." Yet, the ALJ appropriately acknowledged that Plaintiff's medical records do note the presence of Plaintiff's anxiety and depression symptoms since his alleged onset date, and he even gave due deference to these notations by including several mental health restrictions in his RFC assessment of Plaintiff prior to June 7, 2011(R. 21).

## III. CONCLUSION

Based upon the foregoing, the Court concludes that the ALJ's findings were supported by substantial evidence and complied with applicable law. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 9) be denied, Defendant's Motion for Summary Judgment (ECF No. 12) be granted, and the decision of the ALJ be affirmed.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file objections will waive the right to appeal.  Brightwell v. Lehman, 637 F. 3d 187, 193 n. 7 (3d Cir.

2011).

/s/ Susan Paradise Baxter
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.